Michael R. Rochelle
State Bar No.17126700
Chris B. Harper
State Bar No. 09025500
Eric M. Van Horn
State Bar No. 24051465
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P:  (214) 953-0182
F:  (214) 953-0185

ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| NORTH AMERICAN TECHNOLOGIES | § | |
| GROUP, INC. *et. al.,* | § | Case No. 10-20071 |
| | § | |
| Debtors. | § | Jointly Administered |

## DEBTORS' AMENDED MOTION FOR AN ORDER:
## (I) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE; (III) ESTABLISHING A SALE OBJECTION DEADLINE; (IV) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION/ASSIGNMENT OF CERTAIN UNEXPIRED LEASES OR AND/OR EXECUTORY CONTRACTS; (V) APPROVING FORM OF NOTICES AND NOTICE PROCEDURES; AND (VI) FOR OTHER RELIEF

TO THE HONORABLE BILL PARKER, CHIEF UNITED STATES BANKRUPTCY JUDGE:

North American Technologies Group, Inc. ("NATK"), a Delaware corporation, TieTek Technologies, Inc. ("TTT"), a Texas corporation, and TieTek LLC ("TieTek"), a Delaware limited liability company (collectively, the "Debtors"), debtors and debtors in possession jointly administered under the above-captioned case (collectively, the "Chapter 11 Cases"), hereby file this *Debtors' Amended Motion For An Order: (I) Approving Bid Procedures For Sale Of Substantially All Of The Debtors' Assets; (II) Scheduling A Hearing To Consider The Sale; (III) Establishing A Sale Objection Deadline; (IV) Establishing Procedures Relating To*

*Assumption/Assignment Of Certain Unexpired Leases Or And/Or Executory Contracts; (V) Approving Form Of Notices And Notice Procedures; And (VI) For Other Relief* (the "<u>Motion</u>").[1]

In support of the Motion, the Debtors respectfully state as follows:

## I.
## <u>JURISDICTION AND VENUE</u>

1.      This Court (the "<u>Bankruptcy Court</u>") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157(a) and 1334.

2.      The Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested here are sections 105, 363, 365 and 503(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## II.
## <u>SUMMARY OF RELIEF REQUESTED</u>

4.      The Debtors intend to sell substantially all of their assets (the "<u>Assets</u>")[2] following the solicitation of qualified bids and an open, no-reserve auction (the "<u>Auction</u>").  In connection with the sale of the Assets and Auction, the Debtors also intend to assume and assign certain executory contracts and unexpired leases to the purchaser of such Assets (collectively, the "<u>Assigned Agreements</u>").

---

[1] This Motion amends the Debtors' previously filed motion [Docket No. 63] in paragraph 15 below by clarifying that the Debtors' will file their Sale Motion (defined below) on or before the date the Bankruptcy Court considers this Motion such that the Debtors will not be filing the Sale Motion today (July 1, 2010).  Because this is the only amendment to the motion, the Debtors, to avoid duplication and waste of estate assets, will serve only this amended motion with the exhibits referenced herein.

[2] The defined term "Acquired Assets" is used in the proposed Bid Procedures and the proposed Model APA.  That term is used in the Model APA to define the assets being purchased, whereas that term is used in the proposed Bid Procedures to define the assets being offered for sale.  The scope of the assets to be purchased is subject to negotiation and, as described in this Motion, bids may be for all or any portion of the assets.

5.     By and through this Motion, and in furtherance of the sale effort, the Debtors respectfully request entry of an order substantially in the form of the proposed order attached here as **Exhibit "A"** (the "Bid Procedures Order"):

a)     Approving bid procedures in the form of Exhibit "1" to the proposed Bid Procedures Order (the "Bid Procedures");

b)     Approving proposed cure procedures and notice to Agreement Counterparties (defined herein) of the Debtors' intention to assume and assign the Assigned Agreements, of the Cure Amounts (defined herein), if any, proposed by the Debtors in connection therewith, and of the Assumption/Assignment Objection Deadline and requirements to file an Assumption/Assignment Objection (referred to herein as the Cure Procedures);

c)     Approving proposed notice procedures and forms to parties in interest of the Bid Procedures, Auction, the Sale Hearing, the Sale Objection Deadline, the proposed assumption and assignment or transfer by agreement of Assigned Agreements, if any (referred to herein as the Notice Procedures).

d)     Establishing a deadline for the filing of objections to the Sale Motion and acceptance of the Successful Bidder (defined herein as the "Sale Objection Deadline");

e)     Establishing a deadline (the "Assumption/Assignment Objection Deadline") for counter-parties to any Assigned Agreements (the "Agreement Counterparties") to file an objection to the assumption and assignment, or the cure amount proposed, of any Assigned Agreement (an "Assumption/Assignment Objection");

f)     Establishing a date and time for a hearing on the Debtors' Sale Motion (defined herein) (the "Sale Hearing");

g)     Waiving the automatic fourteen-day stay provided by Bankruptcy Rules 6004 and 6006, to the extent applicable to the Bid Procedures Order, so that the order is effective and enforceable immediately upon entry on this Court's docket.

## II.
## FACTUAL BACKGROUND

**A.     The Debtors' Businesses and Events Leading to Chapter 11.**

6.     TieTek is a wholly owned subsidiary of TTT, which is a wholly owned subsidiary of NATK. The Debtors' principal place of operations is in Marshall, Texas. TieTek is the primary operating company that designs, manufactures, and markets composite railroad ties.

7.     TieTek is a market leader in composite railroad tie design and manufacturing. TieTek ties use recycled plastic materials and vehicle tires to manufacture durable and sustainable railroad ties that outperform traditional wooden railroad ties.  Production of 3,300 TieTek ties (approximately one mile of railroad track) reuses approximately 2 million plastic bottles, 9 million plastic bags, and 10,000 scrap vehicle tires. TieTek's ties are used in class I railroad installations (mainly for freight transport), transit rail installations (for transport of commuters), and railroad bridge installations.  TieTek's ties may last up to forty years, compared to the approximate five to seven year lifespan of traditional wooden ties, but are considerably more expensive than wooden ties.  Thus, while TieTek's ties may significantly reduce long-term track maintenance costs, they are more expensive to purchase than traditional wooden ties. TieTek's customers have included some of the largest railroad companies in the United States. At its peak, TieTek had over 130 employees.  The production facility in Marshall, Texas has been in operation since 2004.  As more fully described in the Dorman Declaration, the factors leading to these Chapter 11 Cases include regular business and manufacturing start-up issues, increased raw materials costs, a soft railroad tie market, turnover in the executive and management ranks, significant litigation, and reduced funding from the Debtors' lenders.  As a result, the Debtors were forced to cease their manufacturing operations in August 2009.

**B.  The Debtors' Loans With Opus**

8.     The Debtors, jointly and severally, entered into (i) that certain Promissory Note dated July 7, 2005 (the "2005 Note"); and (ii) that certain Amended and Restated Promissory Note dated August 20, 2009 (the "2009 Note") with Opus 5949, LLC ("Opus") to borrow $14,000,000.00 and $340,000.00, respectively (collectively, together with all related loan documents and security agreements, the "Opus Loan Agreement").  As of the Petition Date, the total outstanding balance owed to Opus under the Opus Loan Agreement, and amendments

thereto, is at least $16,382,645.55.

## C. The Debtors' Bankruptcy Cases

9.      The Debtors' Chapter 11 Cases were commenced by the filing of voluntary petitions on March 18, 2010 (the "Petition Date") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their property as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.  On or about April 2, 2010, the U.S. Trustee appointed an official unsecured creditors' committee (the "Committee").

10.      On the Petition Date, the Debtors had ceased operations and had approximately $450,000 remaining in its operating account.

11.      On or about April 26, 2010, the Court entered the *Agreed Order (I) Authorizing Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Granting Adequate Protection To Opus 5949 LLC Pursuant to 11 U.S.C. §§ 361, 362 & 363* (Docket No. 41, the "Final Cash Collateral Order") whereby Opus consented to the use of cash collateral pursuant to the express terms and conditions set forth in this Final Cash Collateral Order.

12.      Pursuant to the Final Cash Collateral Order, *inter alia*, all the Debtor and/or any parties in interest including the Committee were required to challenge to the validity, perfection, or priority of the security interest and liens of Opus by way of adversary proceeding on or before June 9, 2010 (the "Challenge Deadline").  Because no adversary proceeding was commenced on or before the Challenge Deadline, the Debtor and all parties in interest, including the Committee, are deemed to have agreed and acknowledged that Opus' liens against and security interests in the Collateral (as defined in the Final Cash Collateral Order) are legal, valid, binding, perfected, and otherwise unavoidable, and Opus' liens shall not be subject to any challenge by the Debtor, the Committee, or any other party in interest.

13.     Since the beginning of the Chapter 11 Cases, the Debtors' goal was to market their assets, secure a stalking horse bidder, and conduct a public option to maximize any return to creditors.  The Debtors employed a business broker to assist with the market and sale of the Assets.  While significant interest has been generated, the Debtors have been unsuccessful in securing a stalking horse bidder prior to the filing of this Motion.[3]  The Debtors reserve their right to seek Court approval of an agreement with a stalking horse at any time prior to the Auction.

14.     As of the filing of this Motion, only about $100,000 remains in the Debtors' operating account that is available for the Debtors' operations.  Pursuant to the Debtor's most recent cash collateral budget filed with the Court, the Debtors are spending approximately $65,000 per month.  *See* Docket No. 56, Exhibit A.  Accordingly, time is of the essence to conduct the sale and Auction the Assets because of the Debtors' limited cash and inability to generate revenue due to its lack of operations.   The Debtors believe that they must proceed with the approval of bidding procedures and the Auction without a stalking horse to preserve value of the Assets as a going concern and to prevent conversion of this case to a Chapter 7 liquidation.

## IV.
## THE PROPOSED SALE PROCEDURES AND ASSET SALE[4]

15.     On or before the date this Motion is considered by the Bankruptcy Court, the Debtors will also be filing a *Motion for Order Authorizing Sale and Approving Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "Sale Motion"), whereby the Debtors are requesting (i) the approval of the sale of the Assets to the Successful Bidder, and (ii) the approval of the assumption and assignment of the Assigned Agreements.

16.     The Debtors propose to conduct the Auction at the offices of Rochelle

---

[3] Since the Petition Date, three prospective buyers expressed interest in being a stalking horse bidder. As of the filing of this Motion, however, no stalking horse agreement has been reached with any of these parties.

[4] The proposed sale procedures are set forth in more detail in the Sale Motion.

McCullough, LLP, 4500 Republic Center, 325 North St. Paul St., Dallas, Texas, 75201, on a date to be set by the Court approximately thirty (30) days after the approval of the Bid Procedures.

17.      At the conclusion of the Auction, the Debtors will select the best final bid for the Assets (the "Successful Bid," and the bidder making such bid, the "Successful Bidder") and the second highest and best bid (the "Backup Bid," and the bidder making such bid, the "Backup Bidder").

18.      The Debtors will provide notice of the Successful Bid and Backup Bid to Opus, the Committee and their counsel (collectively, the "Oversight Parties"), and to each Qualified Bidder (defined herein) that participates in the Auction.  The Debtors will also seek Court approval of the proposed sale transaction at the Sale Hearing.  Upon Court approval, the Successful Bidder will be required to comply with the Bid Procedures, execute an approved Asset Purchase Agreement in substantially similar form as is attach hereto as **Exhibit "B"** (the "Model APA"), as may be revised by agreement between the parties, and proceed to a closing at an agreeable time and place as soon as reasonably practicable, but no later than thirty (30) days after Court approval of the sale.

## VI.
## PROPOSED BID PROCEDURES

19.      The Debtors are offering substantially all of their assets for sale.  In relation to the Assets, the Debtors propose to solicit offers under substantially the same terms and conditions as the Model APA attached hereto as Exhibit B.

20.      The Debtors and their professionals have designed the Bid Procedures described below in effort to obtain the highest and best price for the Assets at the Auction.  Accordingly, the Debtors seek the Court's approval of the Bid Procedures, which are summarized below.[5]

---

[5] To the extent that the following summary conflicts with, or differs from, the procedures as set forth in Exhibit "1" to the proposed Sale Procedures Order, the procedures in Exhibit "1" will control.  Moreover, any capitalized term in

## A. Notice to Parties.

21. **Within two (2) business days of entry of the Bid Procedures Order**, the Debtors will serve a copy of the Bid Procedures Order, together with all related exhibits, on all entities listed on the current Master Service List, known parties that have or may assert a lien on or security interest in some or all of the Assets, known Agreement Counterparties to the Assigned Agreements, and all parties who previously contacted the Debtors and/or their professionals to express a bona fide interest in acquiring some or all of the Assets or otherwise exhibited a realistic intention to participate in the sale process

22. **Within five (5) business days of the entry of the Bid Procedures Order**, the Debtors shall cause a notice with respect to the sales process to be published in the following publications: *The Dallas Morning News, The Marshall News Messenger*, plus such other local newspapers as may give appropriate additional notice in areas where the Debtors maintain operations, to publish notice of the proposed Asset sale and Auction. Such notice shall provide the following information: (i) a general description of the Assets for sale; (ii) the Bid Deadline; (iii) the date, time and place of the Sale Hearing; (iv) the Sale Objection Deadline; (v) the Assumption/Assignment Objection Deadline; and (vi) the means by which interested parties may obtain a copy of the Bid Procedures, the Sale and Auction Notice, the Cure Amount Notice and the Sale Motion. The Debtors' timely compliance with the foregoing Notice Procedures shall constitute proper, timely, adequate and sufficient notice satisfying the requirements of Sections 363(b), 363(f) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008.

23. Paragraphs 22 and 23 herein are collectively referred to as the "Notice Procedures."

the summary of the Bid Procedures that is not otherwise defined herein shall have the meaning ascribed to it in the Bid Procedures.

**B.      Bids**

24.      All bids (each a "<u>Bid</u>") on the Assets must be in writing and be accompanied by all required information and documentation as specified herein (collectively, the "<u>Bid Package</u>"), and must be received by the Debtors by e-mail or at the offices of their counsel **on or before 12:00 noon (CDT) July 30, 2010** (the "<u>Bid Deadline</u>"), in order to be treated as timely and qualified.  A Bid will not qualify for consideration by the Debtors unless (i) the Bidder submits a Bid Package in compliance with the Bid Procedures, and (ii) the Bid Package is actually received by e-mail to Joe B. Dorman, General Counsel of the Debtors ([joebcpajd@netscape.net](mailto:joebcpajd@netscape.net)), and Robert Fowler, Business Broker of the Debtors ([robert@vrstlouis.com](mailto:robert@vrstlouis.com)).

25.      All Bids shall be for cash (and the possible assumption of certain liabilities) with no financing or further due diligence contingency or condition.

**C.      Qualified Bids.**

26.      In order for a Bid to qualify for consideration (a "<u>Qualified Bid</u>"), the Bidder's Bid Package must include:

a)      A written Bid, executed by the Bidder or its duly-authorized representative, setting forth the assets sought to be acquired by the Bidder, the consideration offered, and the Bidder's commitment to the open and irrevocable nature of the Bid (during the periods of time more fully set forth in the Bid Procedures);

b)      Satisfactory financial information demonstrating an ability to close the purchase and perform all ongoing obligations associated therewith;

c)      Evidence of requisite internal authorizations and approvals;

d)      An executed definitive agreement in substantially the same form as the Model APA, along with a redline reflecting any differences between the submitted asset purchase agreement and the Model APA (the "<u>Marked APA</u>");

e)      An executed escrow agreement (the "<u>Escrow Agreement</u>") for the establishment of an escrow account (an "<u>Escrow Account</u>") with _____ Bank as escrow agent (the "<u>Escrow Agent</u>"), and receipt of the Deposit (as defined herein); and

f)      A deposit in the amount of $100,000 (the "<u>Deposit</u>"), which shall be made by cashier's check made payable to the Escrow Agent.

27.     Any party who submits a timely Bid satisfying all of the necessary requirements for bidding shall be deemed a "Qualified Bidder" and each Bid of such Qualified Bidder shall be deemed a "Qualified Bid".  Each Qualified Bidder shall be notified of such designation by the Debtors.

28.     Any party who has timely submitted a Bid but has failed to satisfy all necessary requirements of Bid Package shall be promptly notified in writing by the Debtors and given an opportunity to promptly cure such defects at the Debtors' discretion and satisfaction, but with the consultation of the Oversight Parties, any time prior to commencement of the Auction.

29.     Only Qualified Bidders shall be allowed to participate at the Auction, unless the Debtors, with the consultation of the Oversight Parties, authorize an interested buyer to participate in the Auction and bid on all or any portion of the Assets at any time prior to commencement of the Auction.

30.     The Debtors may negotiate with potential stalking horse buyers and enter into a stalking horse asset purchase agreement (a "Stalking Horse APA") for the sale of all or any portion of the Assets prior to the Auction.  If a Stalking Horse APA is executed, any break-up fee, termination fee, and/or expense reimbursement, to the extent any are provided for under the Stalking Horse APA, must be approved by this Court prior to the Auction.

31.     In the event that the Debtors (i) secure a stalking horse buyer prior to the Auction, (ii) the Debtors and the stalking horse have executed a Stalking Horse APA, and (iii) the Court has approved any break-up fee, seller termination fee, and/or expense reimbursement, if applicable, then any subsequent Bid to purchase the Assets contemplated under the Stalking Horse APA must exceed the stalking horse's purchase price by at least the minimum bid increment *plus* any approved fee or expense reimbursement to be considered a Successful Bid or Backup Bid (as those terms are defined herein).

32.     **By approximately 5:00 p.m. (CDT) on the Bid Deadline**, the Debtors shall provide a copy of all Bids received by the Bid Deadline to the Oversight Parties. Thereafter, the Debtors, in consultation with the Oversight Parties, will determine which of those Bids are Qualified Bids and which of the parties that submitted those Bids are Qualified Bidders.

33.     **By approximately 5:00 p.m. (CDT) on August 2, 2010**, the Debtors shall provide to the Oversight Parties, and each interested party that submitted a timely Bid with a list identifying which of the interested parties are Qualified Bidders, and a summary of the Qualified Bids (or the stalking horse bid, if applicable).

**E.      Potential Stalking Horse.**

34.     The Debtors have not secured a stalking horse buyer as of the filing of this Motion. However, the Debtors believe that it would be valuable to their bankruptcy estates if they entered into a Stalking Horse APA with a stalking horse prior to the Auction. Accordingly, the Debtors reserve the right to enter into a Stalking Horse APA for all or a portion of the Assets. Any break-up fee, seller termination fee, and/or expense reimbursement, if applicable, must be approved by the Court prior to the Auction.

**F.      The Auction**.

35.     The Auction will be conducted on **August 4, 2010 at 10:00 a.m. (CDT)** at the offices of the Debtors' counsel, Rochelle McCullough, LLP, located at 4500 Republic Center, 325 North St. Paul, Dallas, Texas 75201.

36.     The Auction shall be conducted with all Bidders authorized by the Debtors to participate in the Auction in one room on an open basis. The identity of each Bidder authorized to participate at the Auction and all material terms of each bid increment shall be fully disclosed to all participating Bidders.

37.     The Bidders are be permitted to increase their Bids.  The initial minimum required bid increment for the Assets is $50,000.  As the Auction proceeds, the Debtors, in consultation with the Oversight Parties, shall have the right to change required bid increments at any time upon verbal notice to all Bidders authorized to participate in the Auction.

38.     Qualified Bidders who increase their Bids above the level to which they have demonstrated financial capability to consummate a transaction to the satisfaction of the Debtors may be required to provide proof of their financial wherewithal prior to the Debtors' acceptance of such an increased bid.  All parties are encouraged to pre-qualify to the amount for which they may wish to bid or to bring proof of financial capability at such higher level with them to the Auction.

39.     Opus may participate at the Auction and any credit bid by Opus for all or any portion of the Assets at the Auction shall be deemed a Qualified Bid.

40.     The Debtors intend to sell all of their Assets to a single Successful Bidder. However, the Debtors shall in their discretion and, upon consultation with the Oversight Parties, may sell all or *any portion of* the Assets to multiple Qualified Bidders, including without limitation, Opus (pursuant to a credit bid) if it would maximize the value to its creditors and estates.

41.     The Debtors in their discretion, and after consulting with the Oversight Parties, shall determine what they consider in their business judgment to be the best Bid for a particular Asset or category of Assets (the Successful Bid), and the next best Bid below the Successful Bid (the Backup Bid).  The Successful Bid shall remain open, irrevocable and binding on the Successful Bidder until the closing of the sale to the Successful Bidder, and the Backup Bid shall remain open, irrevocable and binding on the Backup Bidder until the earlier of:

        a)      Five (5) business days after the applicable Successful Bidder closes; or

b) Thirty (30) days after conclusion of Sale Hearing.

42. At the conclusion of the Auction, the Debtors shall provide notice of the identity of the Successful Bidder and Backup Bidder for the Assets to all parties in interest involved in the Auction. For each Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder, the Debtors will promptly instruct the Escrow Agent to return such Bidder's Deposit pursuant to the terms of the Escrow Agreement and such Qualified Bids will cease to be binding and irrevocable.

**G.    Acceptance of Successful Bids, Closing, and Establishment of Sale Objection Deadline.**

43. If the Debtors, upon consultation with the Oversight Parties, determine that a Successful Bid is a reasonable Bid that provides the greatest benefit to their estates under the circumstances, then the Debtors may accept that Successful Bid subject to this Court's approval at the Sale Hearing.

44. The Debtors request the Court establish a deadline for any objection to the Sale Motion and the Debtors' determination to accept the Successful Bid (a "Sale Objection") be set as **5:00 p.m. (CDT) on August 9, 2010** (the "Sale Objection Deadline"). All Sale Objections must (i) be in writing, (ii) specify the specific grounds for objection, and (iii) be filed with the Bankruptcy Court and served on counsel for the Oversight Parties no later than the Sale Objection Deadline; and that any Sale Objection failing to comply with such requirements be deemed waived and subject to denial by the Bankruptcy Court on such basis.

45. The Debtors propose that the Sale Hearing be scheduled to take place **no later August 11, 2010**.

**H.    Miscellaneous.**

46. If a Bidder wishes to make a Bid for the Assets, it will be required to submit its Bid using terms in substantially the same form as those set forth in the Model APA. Any

additional or revised terms to the Model APA that were proposed in its Marked APA submitted with the Successful Bidder's Bid Package, if applicable, must be approved by the Debtors with the consultation of the Oversight Parties prior to the conclusion of the Auction.

47.     All interested parties are entitled to request reasonable and appropriate due diligence information (data room, inspection of assets, etc.) upon providing the following information as required by the proposed Bid Procedures:

(i)     An executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel (the "Confidentiality Agreement");

(ii)    Information to allow the Debtors to adequately identify the party bidding on the Assets and, if the party is an entity, such information as to allow the Debtors to identify the officer(s) or authorized agent(s) who will appear on behalf of the party;

(iii)   Satisfactory financial information that demonstrates the person or entity's ability to close the purchase and perform all ongoing obligations associated therewith; and

(iv)    A statement demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing the Assets.

48.     All Qualified Bids, Successful Bids, and Backup Bids are subject to final approval and acceptance by the Debtors, in consultation with the Oversight Parties.  Moreover, the Debtors are authorized to consider and accept a credit bid as a Qualified Bid and Successful Bid from Opus for all or any portion of the Assets.

49.     While the Debtors will consult with the Oversight Parties on the matters noted above, if any disagreement or dispute arises, the Debtors in their sole discretion and in exercise of their business judgment will make the final determination on all matters related to the Bid Procedures and the Auction.

50.     A party's participation in the sale process outlined herein shall constitute (a) consent by such party to be subject to the jurisdiction of the Bankruptcy Court in connection with

matters relating to the Bid Procedures and sale process for all purposes; and (b) an acknowledgment of the party's review, understanding and acceptance of the Bid Procedures.

# VII.
## PROCEDURES TO ADDRESS ASSUMPTION/ASSIGNMENT
## OF ASSIGNED AGREEMENTS

**A.** **Assumption and Assignment or Transfer by Agreement of Assigned Agreements.**

51.      The Debtors propose to assume and assign, or otherwise transfer by agreement, certain Assigned Agreements to the Successful Bidder.

52.      In connection with the assumption and assignment of Assigned Agreements, the Debtors have prepared a schedule (the "Cure List") reflecting all cure, compensation, and reinstatement costs or expenses (if any) that the Debtors believe must be paid to Agreement Counterparties under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of such Assigned Agreements (collectively, the "Cure Amounts").[6]  The Cure List will be attached as an exhibit to the proposed Cure Amount Notice attached to the proposed Bid Procedures Order as Exhibit "3".

53.      The Successful Bidder will be responsible for demonstrating adequate assurance of future performance, if necessary, with respect to all obligations under Assigned Agreements, if any, proposed to be assigned to the Successful Bidder.

**B.** **The Procedures to Address Assumption/Assignment Objections and Cure Amount Objections.**

54.      The Debtors shall serve a notice of any Assigned Agreements that may be assumed or assigned and accompanying Cure Amounts associated with same by serving the Cure Amount Notice to all known Agreement Counterparties to the Assigned Agreements **within two (2) business days after the entry of the proposed Bid Procedures Order**.  The Debtors request

---

[6] An Agreement Counterparty's inclusion on the Cure List does not mean, by itself, that the applicable Assigned Agreements will, in fact, be assumed and assigned as part of the sale of assets, or that such agreements will be proposed to by the Debtors be assumed and assigned.

that the Court approve the following Cure Procedures for Assumption/Assignment Objections (collectively, the "Cure Procedures").

55.     The Debtors will serve the Cure Amount Notice together with the Cure List, which contains calculation of the Cure Amounts that the Debtors believe must be paid to cure or otherwise remedy all defaults under the Assigned Agreements consistent with Section 365 of the Bankruptcy Code.  If no amount is listed on the Cure List, the Debtors believe that there is no Cure Amount required to assume and assign the associated Assigned Agreement.  In connection with the sale process, the Debtors will also identify which of the Assigned Agreements, if any, that may be assigned to each particular Successful bidder (or Backup Bidder in the event that the sale to the Successful Bidder fails to close) and provide notice of same to the Agreement Counterparties.

56.     Any objection by an Agreement Counterparty to the assumption and assignment of its Assigned Agreement, or to the Cure Amount set forth on the Cure List attached to the Cure Amount Notice in relation to such Assigned Agreement must (i) be in writing, (ii) specify the specific grounds for objection, and (iii) be filed with the Court and served on counsel for the Debtors, Rochelle McCullough, LLP, Attn: Michael R. Rochelle, Esq. or Eric M. Van Horn, Esq., 325 N. Saint Paul, Suite 4500, Dallas, Texas 75201 (each an "Assumption/Assignment Objection"), so that it is **actually** **received** on or before the Assumption/Assignment Objection Deadline (defined herein).

57.     Moreover, in the case an Agreement Counterparty objects to any Cure Amount its objection, the Debtors propose that Agreement Counterparties be required to: (a) specify the amount that the Agreement Counterparty asserts is the correct Cure Amount; and (b) provide supporting documentation and other evidence substantiating the asserted Cure Amount.

58.     After receipt of an Assumption/Assignment Objection that involves the Cure Amount, the Debtors will attempt to reconcile any differences in the Cure Amount believed by the objecting Agreement Counterparty to exist. If, however, the Debtors and the objecting Agreement Counterparty cannot consensually resolve the Cure Amount dispute by agreement, such objection will be resolved by the Court at the Sale Hearing.

59.     If the Court determines that the proper Cure Amount is greater than the amount listed on the Cure List, the Debtors or the Successful Bidder may either go forward with assumption and assignment of the Assigned Agreement or they may remove such agreement from the proposed sale transaction and the relevant schedule to the operative asset sale and purchase agreement.

60.     The Debtors will be responsible for resolving any dispute over the proposed Cure Amounts with any Agreement Counterparty timely filing a Cure Amount Objection.

61.     The Debtors request that Agreement Counterparties be required to file and serve an Assumption/Assignment Objection on or before **5:00 p.m. (CDT) on August 9, 2010** (the "Assumption/Assignment Objection Deadline").

62.     In the absence of an Agreement Counterparty's filing and service, on or before the Assumption/Assignment Objection Deadline, of a written Assumption/Assignment Objection, such Agreement Counterparty shall be deemed to have consented to the assumption and assignment of the Agreement Counterparty's Assigned Agreement in connection with the Asset sale.  Similarly, in the absence of a Agreement Counterparty's filing and service, on or before the Assumption/Assignment Objection Deadline, of a written Cure Amount Objection: (i) the Cure Amount set forth on the Cure List with respect to such Agreement Counterparty's Assigned Agreement shall be binding on such Agreement Counterparty; (ii) the Agreement Counterparty shall be, and is hereby, forever barred and estopped from asserting against the Debtors and its

estates, and the assignee of the Agreement Counterparty's Assigned Agreement that any amount in excess of the Cure Amount identified on the Cure List is due, that any other defaults exist under the Assigned Agreement, or that any other conditions to the assumption and assignment of the Assigned Agreement exist; and (iii) payment to the Agreement Counterparty of the Cure Amount identified on the Cure List in connection with the assumption and assignment of the Assigned Agreement shall be deemed to constitute satisfaction in full of all obligations required under Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Agreement

63.     The Debtors and thier estates shall have no further or continuing liability to the Agreement Counterparty under the Assigned Agreement.   In the event that an Agreement Counterparty files and serves an Assignment Objection or Cure Amount Objection on or before the Assumption/Assignment Objection Deadline, such objection (if not consensually resolved) shall be heard and determined at the Sale Hearing unless hereafter ordered otherwise.

## IX. BASIS FOR RELIEF REQUESTED

**A.     Applicable Legal Standards**

64.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a). Further, section 105(d) of the Bankruptcy Code provides, in pertinent part, that:

> The court, on its own motion or on the request of a party in interest . . . unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, [may] issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically.

11 U.S.C. § 105(d)(2).

65.     Section 363(b)(1) of the Bankruptcy Code permits a debtor to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. §

363(b)(1). Courts authorize the use of estate property outside the ordinary course of business so long as there is a legitimate business justification. *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipner*, 933 F.2d 513, 515 (7th Cir. 1991)); *Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

66.     Once the debtor articulates a valid business justification for a use of estate property under section 363(b)(l), the court reviews the debtor's request under the "business judgment rule," which triggers "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkurn,* 488 A.2d 858, 872 (Del. 1985)); *see also Institutional Creditors of Cont'l Air Lines Inc. v. Cont'l Air Lines Inc. (In re Cont'l Air Lines Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986).

67.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management or a debtor from judicial second guessing. *See In re Myers*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that "under normal circumstances the court would defer to the Debtors' judgment so long as there is a legitimate business justification"); *Montgomery Ward*, 242 B.R. at 153.

68.     As part of the sale of property of the estate "other than in the ordinary course of business" under section 363(b) of the Bankruptcy Code, a debtor may induce an interested party to expend the resources necessary to serve as the "stalking horse bidder" by offering that party certain bid protections. Those bid protections take many forms including, without limitation, a break-up or topping fee, expense reimbursement, minimum overbid increments, limitations on the marketing of the assets (for example, a "no shop" or "window shop" clause), bidder qualifications

requirements, and short deadlines for competing bidders' due diligence and submission of competing bids. *See* Collier on Bankruptcy ¶ 363.2[6] (15th ed. 2009).

69.     Most courts hold that implementing and, if necessary, awarding bid protections to a "stalking horse bidder" is an appropriate exercise of a Debtors' business judgment. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc*., 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating that such procedures "encourage bidding to maximize the value of the debtor's assets); *Cantaxx Gas Storage Ltd. v. Silverhawk Capital Ptns*., LLC, 2008 U.S. Dist. LEXIS 37803, 17-18 (S.D. Tex. May 8, 2008) (stating that "[b]reak-up and similar fees are common in corporate transaction . . . [s]uch fee provision may . . . enhance the bidding process by creating momentum toward closing the sale"); *In re Food Barn Stores Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (stating that, in bankruptcy sale, "a primary objection of the Code [is] to enhance the value of the estate at hand").

**B.     Approval of the Bid Procedures, Notice Procedures, and Cure Procedures Procedures is Justified under Sections 105(a), 105(d), 363(b) and 503(b) of the Bankruptcy Code**

70.     The Debtors believe that the proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best offers for the Assets. The Debtors believe that the Bid Procedures are sufficient to encourage bidding for the Assets; are consistent with other procedures previously approved by the Court; and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

71.     The Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the Debtors' interest in minimizing administrative expense to the estates. The Debtors therefore have valid business justifications for seeking approval of the Bid Procedures at this juncture.

72.     The Debtors believe, in the exercise of their prudent business judgment, that the Bid Procedures benefit their estates and their creditors and other stakeholders.  The Bid Procedures allow the Debtors, through the coordinated efforts of their professionals, to entertain all reasonable Bids for the Assets.

73.     The Debtors believe that the Notice Procedures comply with Bankruptcy Rules 2002, 6004 and 6006, and are reasonably calculated to provide due, adequate and timely notice to all parties in interest of the Bid Procedures, the Auction, the Sale Hearing, the Sale Objection Deadline, the proposed assumption/assignment of Assigned Agreements, and the Assumption/Assignment Objection Deadline.

74.     Similarly, the Debtors believe that the Cure Procedures are reasonable and appropriate and consistent with the provisions of Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Cure Procedures have been tailored to provide an adequate opportunity for all Agreement Counterparties to Assigned Agreements to raise any objections that they may have to the proposed assumption/assignment and/or to the Cure Amounts proposed by the Debtors in connection therewith.

75.     Approval of all of the foregoing procedures and protections will greatly assist the Debtors in realizing maximum value for the Assets and minimizing the administrative costs incurred in furtherance of the proposed Sale.  Consequently, the Debtors submit that granting the requested relief is appropriate and warranted under the circumstance.

## X. PRAYER

WHEREFORE, the Debtors request entry of an order substantially in the form of the proposed Bid Procedures Order attached hereto as **Exhibit "A"**, thereby:

a)     Approving the proposed Bid Procedures (attached hereto as Exhibit "1" to the order);

b)     Approving of the proposed Cure Procedures;

c)    Approving of the Notice Procedures, including the proposed form and use of the Sale and Auction Notice (attached as Exhibit "2" to the Order) and Cure Amount Notice (attached as Exhibit "3" to the Order);

d)    Setting a Sale Objection Deadline;

e)    Setting an Assumption/Assignment Objection Deadline;

f)    Setting the date and time of the Sale Hearing;  and

g)    Waiving the automatic 14-day stay provided by Bankruptcy Rules 6004 and 6006, to the extent applicable to the Bid Procedures Order.

DATED: July 1, 2010.

Respectfully submitted,

**NORTH AMERICAN TECHNOLOGIES GROUP, INC., ET AL., DEBTORS**

/s/ Eric M. Van Horn

_____
Michael R. Rochelle
State Bar No.17126700
Chris B. Harper
State Bar No. 09025500
Eric M. Van Horn
State Bar No. 24051465
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P:  (214) 953-0182
F:  (214) 953-0185

**ATTORNEYS FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on July 1, 2010, a true and correct copy of the Motion has been served *via* regular first class U. S. mail, postage prepaid, facsimile, and/or electronic mail through the Court's electronic notification system to all parties on the attached list.

  /s/ Eric M. Van Horn
Eric M. Van Horn